IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DESTIN ALLEN LEWIS                                              PLAINTIFF

V.                        CASE NO. 5:17-cv-05099

SHERIFF HOLLOWAY, Benton
County, Arkansas; LIEUTENANT
HOLT; EMILY HOFER, Dietician;
NURSE CARLOS RAMOS, Employed
by Southern Health Partners; and
CATERING BY MARLINS, d/b/a
CBM Managed Services                                           DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Plaintiff Destin Allen Lewis brings this civil rights action pursuant to 42 U.S.C.

§ 1983. He proceeds *pro se* and *in forma pauperis* and contends that his constitutional

rights were violated while he was incarcerated in the Benton County Detention Center

("BCDC"). Plaintiff filed this action while he was still incarcerated in the BCDC, but he

has since been transferred to the Delta Regional Unit of the Arkansas Department of

Correction ("ADC").

Plaintiff maintains that his constitutional rights were violated in the following ways:

(1) he was denied adequate medical care; (2) he was recklessly exposed to known health

risks; (3) he was denied access to law library materials; and (4) he was denied an

adequate diet. He has named as Defendants Sheriff Holloway and Lieutenant Holt of the

BCDC; Catering by Marlins ("CBM"), the contract food provider for the BCDC; one of

CBM's dieticians, Emily Hofer; and Nurse Carlos Ramos, who is employed by Southern

1

Health Partners ("SHP"), the contract medical care provider for the BCDC. Plaintiff has sued all Defendants in both their individual and official capacities.

The case is before the Court on the Motion for Summary Judgment (Doc. 50) filed by Separate Defendant Nurse Carlos Ramos, the Motion for Summary Judgment (Doc. 54) filed by Separate Defendants CBM and Emily Hofer, and the Motion for Summary Judgment (Doc. 57) filed by Separate Defendants Sheriff Holloway and Lieutenant Holt. Plaintiff has filed a joint response (Docs. 63 & 64) to the pending Motions. Only Separate Defendants CBM and Emily Hofer filed a Reply (Doc. 65).

In reviewing Plaintiff's response to the Motions, it is clear he has not addressed the inadequate diet claim made against CBM and Emily Hofer. He also has left CBM and Emily Hofer out of the style of the case in his response.

## I. BACKGROUND

On March 30, 2017, Plaintiff pleaded guilty to various state criminal offenses. (Doc. 59-2, p. 5). He was booked into the BCDC that same day. (Doc. 52-1, p. 1). His sentencing order was entered on April 28, 2017. (Doc. 59-2, pp. 5-9). Plaintiff remained incarcerated at the BCDC until he was transferred to the ADC on July 27, 2017. (Doc. 52-1, p. 2; Doc. 59-2, p. 10).

BCDC inmates have access to an electronic kiosk to communicate with Sheriff's department staff and medical staff. Inmates must submit general requests, non-emergency medical requests, and grievances through the kiosk. The facts relevant to each of Plaintiff's claims will be set forth below.

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." Nat'l Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

Section 1983 does not create substantive rights. Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). Instead, it provides remedies for deprivations of rights established by the Constitution or the laws of the United States. Id. Two elements are required to establish

3

a claim under § 1983. These elements are: (1) the deprivation of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was committed "under color" of state law. *Lugar v. Edmondson*, 457 U.S. 922, 931 (1982).

## A. First Claim: Denial of Medical Care

### 1. Relevant Facts

Nurse Ramos, a licensed practical nurse, was at all times relevant to the facts in the Complaint an employee of SHP, the provider of healthcare services to inmates at the BCDC. Plaintiff completed a medical questionnaire on March 30, 2017, as part of the booking process, and he did not identify any medical conditions at that time. *See* Doc. 59-4, p. 1.

On April 7, 2017, Plaintiff submitted a request asking why the Tuberculosis ("TB") filter was not working and why he had not "received a TB shot yet?" (Doc. 52-3, p. 1). Plaintiff was medically evaluated on April 10, 2017, but he did not present any current medical complaints. He was administered a tuberculin skin test that same day, and the test was negative. *See* Doc. 52-2, p. 15.

On April 22, 2017, Plaintiff submitted a grievance to jail staff in which he noted that there were inmates in the pod who had been there for months and had not received a TB test. *See* Doc. 52-3, p. 2. He also noted the "filter" was inoperable. *Id.* During Plaintiff's deposition in this case, he was asked whether anyone in his unit was ever identified as having tuberculosis, and he answered, "As far as I know, nope." (Doc. 59-6, p. 30). Nurse Ramos also confirmed in his responses to interrogatories that only one inmate was diagnosed with active tuberculosis at the BCDC from "2016 — June 2017." (Doc. 63, p. 23).

On June 17, 2017, Plaintiff submitted a medical request stating that he believed he had been suffering from dehydration for the past couple of months. *See* Doc. 59-3, p. 19). He noted that he and the other inmates were locked out of their cells for seven to nine hours and only had sixteen ounces of liquid with each meal. *Id.* He noted there was no water fixture in the day room, and the wash basin in the public restroom[1] was filthy and unsanitary to drink from. *Id.*

Plaintiff was again evaluated by medical staff at the jail on June 19, 2017. *See* Doc. 59-4, p. 5. Medical reports note that Plaintiff did not want to drink from the sink and wanted to have a cup in the day room. *Id.* at 6. Plaintiff was educated on the importance of adequate water intake and the signs of dehydration. *Id.* Plaintiff was then instructed to report any decrease in his urine output. *Id.*

On July 2, 2017, Plaintiff was seen by medical staff for left ear pain. (Doc. 52-2, p. 8). Staff noted that his left ear opening was swollen, and the ear canal was dark red. *Id.* His eardrum was "pearly white" and intact. *Id.* He was prescribed Amoxil, an antibiotic, and Ibuprofen, a pain reducer, twice a day for seven days. *Id.* at 9. On July 3, 2017, Plaintiff asked for authorization for a "lay-in" in his cell until the ear infection was cured. (Doc. 52-3, p. 4). That same day, he asked for a higher dose of Ibuprofen because the pain made him very uncomfortable and he could not sleep. *Id.* Medical staff granted his request for more Ibuprofen. *See id.*

On July 5, 2017, Plaintiff complained that he thought he had a fever and believed it was contagious. (Doc. 52-3, p. 6). He submitted a second request for a lay-in until this

---

[1] The public restroom is a cell left open during the period of the day when the inmates are locked out of their individual cells. It gives the approximately thirty inmates assigned to the pod access to a toilet and sink.

infection was gone. *Id.* In response, he was told that unless he had a fever, he could not have bed rest. *Id.* He submitted a third request stating that he did not receive his antibiotic that day because the nurse said they were out of it. *Id.* In response, a note was made that Plaintiff was given his meds. *Id.*

On July 6, 2017, Plaintiff submitted another medical request stating the infection was now moving to his right ear; he had "searing" pain down to his jaw; he believed he had a fever; and it was "torture" being out in the day room all day. *Id.* at 5. He asked if he could be moved to the medical pod. *Id.* In response, Plaintiff was told the medical pod was "reserved for severe acute/chronic conditions only." *Id.*

On July 7, 2017, Plaintiff submitted a request stating that he had spoken with the nurse the previous night about receiving a lay-in, that he had a fever of 99, and that the nurse had ultimately authorized a one-day lay-in. *Id.* at 7. In response, Plaintiff was informed that the nurse could not justify bed rest without a fever. *Id.* Plaintiff submitted another request stating he wanted to make sure he was placed on doctor call. *Id.* In response, he was told he had been on the list previously, but he had refused sick call. *Id.*; *cf.* Doc. 52-2, p. 10 (noting that he refused sick call because he believed he was getting better). That same day, Plaintiff submitted a grievance asking what the policy was for being granted a lay-in. (Doc. 52-3, p. 7). He asked why he could not get a lay-in with a painful ear infection, regardless of whether he had a fever. In response, medical staff wrote that an "[i]nfection does not meet criteria for bed for 'lay-in.'" *Id.*

On July 10, 2017, Plaintiff submitted a grievance stating that an inmate had been left in pod E-104 for three days (7/7-7/9) with a staphylococcus bacteria ("staph") infection on his knee. (Doc. 52-3, p. 8). Plaintiff claimed the inmate was seen by the doctor on

July 7th [a Friday] but not removed from the pod until July 10th [a Monday]. *Id.* Plaintiff noted it was the second time an inmate with staph had been left in the pod, and Plaintiff was now afraid to use cell 147 as a restroom because he did not want to get infected with staph. *Id.* In response, he was told that medical staff makes all medical decisions. *Id.*

On July 12, 2017, Plaintiff submitted a medical request stating that he was still suffering from the ear infection after taking antibiotics for seven days. On July 13, 2017, Plaintiff was again prescribed Amoxil for the ear infection, this time for another ten days, and given Ibuprofen twice a day for seven days. (Doc. 52-2, pp. 6, 11-12; Doc. 52-3, p. 3).

On July 18, 2017, Plaintiff submitted a medical request stating he was quite certain that he had a staph infection on his upper left thigh. (Doc. 59-2, p. 22). He indicated he was feeling dizzy and hot. Plaintiff was placed on the nurse's sick call list. *Id.* Then, on July 19, 2017, Plaintiff reported to medical staff that he had an abscess on his left upper thigh that he believed was a spider bite. He was given Benadryl twice a day for three days, and the wound was cleaned with Hibiclens and treated daily. (Doc. 52-2, pp. 6, 13). On July 20, 2017, Plaintiff reported to nursing staff that the abscess could be "something as simple as an ingrown hair or STAFF [sic]." (Doc. 52-3, p. 14).

According to Nurse Ramos, inmates who have known staph infections are placed in medical isolation. (Doc. 63, pp. 23-24). Nurse Ramos indicated that "staph infections are generally treated with antibiotics." *Id.* at 24. Nurse Ramos maintains that he did not have the authority to segregate inmates. Instead, the segregation of inmates was coordinated between SHP's medical team administrator and the jail's administration team. (Doc. 52-1, p. 2).

The BCDC's health policies provide that "[a]ny detainee identified as having a communicable disease shall be segregated as directed by medical staff." (Doc. 63, p. 49). In answering interrogatories, Sheriff Holloway stated that there was an area in B pod that was "equipped with negative air pressure in the cells to filter fresh air in and to limit the spread of the disease(s)." *Id.* at 52. Further, Sheriff Holloway states that "[p]rotocols and medical policies are not adopted, supervised, or enforced by Benton County." *Id.* Instead, "Benton County relies on the professional medical judgment of the medical staff which is provided pursuant to a contract with [SHP]." *Id.*

On July 22, 2017, Plaintiff completed his prescription for the antibiotic Amoxil that he had been given for his ear infection, and he was then prescribed the antibiotic Bactrim for ten days. (Doc. 52-2, p. 7). Medical notes from July 25, 2017, indicate that Plaintiff refused wound care that day. *Id.* at 14. Then, on July 26, 2017, Plaintiff submitted a medical request about having a bruised tailbone. (Doc. 59-3, p. 24). He indicated that he usually sat on two towels to lessen the pain. However, he said he was now being told he had to have approval from medical staff to sit on towels. *Id.* On the following day, July 27, 2017, a medical summary prepared by C. Russell indicated that Plaintiff was cleared for transport to the ADC. (Doc. 63, p. 21). A note in the file indicates that Plaintiff had an abscess or staph infection on his left upper thigh within the last month. *Id.* Plaintiff was sent to the ADC with Bactrim, an antibiotic, for the abscess that was not yet healed.

Plaintiff contends he was aware of two inmates, MJ and TW, who had staph infections while incarcerated at the BCDC. (Doc. 59-6, p. 33). Plaintiff testified that at the end of May, MJ had a boil on his buttocks. *Id.* at 33, 40. MJ was eventually separated from the general population. *Id.* at 43. Plaintiff testified that he was exposed to MJ for

two to three days. TW had a boil on his knee in July. *Id.* at 33, 49. From July 7th to July 9th, Plaintiff claims TW was not isolated. *Id.* at 49. Instead, he was treated with antibiotics. *Id.* at 36. After July 10th, TW was moved to a cell in the same pod as Plaintiff. *Id.* at 52. Plaintiff also testified that he was aware of other inmates who had boils, but Plaintiff could not recall their names. *Id.* at 43. According to Plaintiff, these inmates with boils were not separated from the general population. *Id.* Plaintiff did recall two inmates who were separated from the rest of the group when they were locked down in a cell; however, they were released into the pod for an hour each day, and during that time, they used the same day room, public restroom, phones, tables, and stools as everyone else in the pod. *Id.* Except for the staph infection on his thigh, Plaintiff admits he has not otherwise tested positive for a communicable disease. And although the Plaintiff's boil on his thigh was not specifically tested for staph, it was treated by BCDC medical personnel as a staph infection and was referred to in medical records as such. *Id.* at 27.

Nurse Ramos asserts in his affidavit that there "is no evidence of any causal connection between the alleged Staph infections [of] TW and MJ, and that of the Plaintiff." (Doc. 52-1 at 3). Plaintiff confirms that he did not have an open wound or sore when he was exposed to MJ and TW. (Doc. 59-6, pp. 59-60). In fact, Plaintiff could not recall any inmate who had an open wound at that time. *Id.* at 44. According to BCDC jail records, during the year 2017, there were fifty-one inmates diagnosed with or treated for staph. (Doc. 63, p. 20).

### 2. Analysis of the Medical Care Claim Against Nurse Ramos

Inmates are completely dependent on prison authorities for their medical care. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). The Eighth Amendment's prohibition of cruel

and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners. *Id.* at 106. "The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but *deliberately* disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must demonstrate that he "has been diagnosed by a physician as requiring treatment" or has had an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). Plaintiff was treated first for an ear infection. He was administered two separate rounds of antibiotics and then Ibuprofen for pain. Plaintiff was also treated for an abscess on his upper left thigh that he believed was a staph infection. He suggested the infection could have been the result of an ingrown hair or a spider bite.[2] Medical staff treated the wound with antibiotics and then bandaged it. The Court finds, under these facts, that Plaintiff had more than one objectively serious medical need while he was incarcerated at the BCDC.

To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). Deliberate indifference may be evinced

---

[2] There is no indication that a culture of the wound was ever taken.

by medical staff, by prison guards, or by the administration of the prison. *See, e.g., Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977). "The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Green Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007). The deliberate indifference standard applies only to a narrow band of conduct.

As mentioned above, Plaintiff was treated in the BCDC for both an ear infection and an abscess on his left thigh. With respect to the ear infection, Plaintiff maintains he was not given strong enough pain medication and should have been authorized for a "lay-in." Plaintiff does not dispute that Nurse Ramos did not have the authority to prescribe a stronger pain medication. *See Fitzgerald v. Greer*, 2008 WL 2412995, at *10 (W.D. Wis. June 12, 2008) (noting that non-physicians cannot override the treatment decisions of physicians, prescribe medications, or override a physician's decision to prescribe a medication). This lack of authority, of course, did not prevent Nurse Ramos from providing medical care in ways that did not require prescription medication. However, Plaintiff's written requests for a lay-in were denied by medical personnel other than Nurse Ramos. *See* Doc. 52-3, pp. 4-7.

Even if Nurse Ramos had been the staff member who denied the lay-in request, this would not have demonstrated deliberate indifference to Plaintiff's serious medical needs. At most, Nurse Ramos would have been negligent in applying the established protocol without considering Plaintiff's complaints of fever, pain, and discomfort. *See Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation."). Accordingly,

the Court concludes that there are no genuine issues of material fact as to whether Nurse Ramos was deliberately indifferent to Plaintiff's need for medical treatment of his ear infection.

Turning now to Plaintiff's abscess, this was treated with antibiotics and dressings. When Plaintiff was transferred to the ADC prior to the abscess being completely healed, a note was made on his medical records regarding the abscess. Plaintiff argues, however, that Nurse Ramos was deliberately indifferent in failing to quarantine or isolate Plaintiff on the chance that the abscess was a staph infection. The decision as to whether to quarantine a sick prisoner is ultimately a question of medical judgment, as "a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992). Accordingly, there are no genuine issues of material fact as to whether Nurse Ramos was deliberately indifferent to Plaintiff's medical needs with respect to his abscess.

With respect to Plaintiff's official capacity claim against Nurse Ramos, such a claim is "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010) When Nurse Ramos's employer SHP contracted with the BCDC to provide medical care to its inmates, SHP became regarded as a state actor. *West v. Atkins*, 487 U.S. 42, 54 (1988) (finding that private physician who had a contract with the state to provide medical services to inmates was a state actor). A "corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (citation omitted); *see also*

12

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Thus, SHP can be held liable in this case only if "there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Plaintiff has pointed to no such policy or custom that was the moving force behind the alleged unconstitutional actions. At most, Plaintiff has pointed out that Nurse Ramos did not always strictly adhere to SHP's policies. Nurse Ramos is therefore entitled to summary judgment on both the individual and official capacity claims.

### 3. Analysis of Medical Care Claim Against Benton County Defendants

Plaintiff testified that he believes Sheriff Holloway should be held liable for deliberate indifference because he was "responsible for the whole proceeding, every proceeding in the jail." (Doc. 59-6, p. 45). Plaintiff admits he never saw, talked to, or corresponded with Sheriff Holloway about his medical condition. *Id.* at 46. Plaintiff also does not contend Sheriff Holloway was personally involved in making decisions about his medical treatment.

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell*, 436 U.S. at 694. "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994). Instead, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Mo.*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Here, Plaintiff has not alleged that Sheriff

Holloway was personally involved in any way in making decisions about his medical care. Plaintiff does not allege he directly communicated with Sheriff Holloway; there is no suggestion that Sheriff Holloway was present when any of the alleged unconstitutional actions took place; and there is no suggestion that Sheriff Holloway was involved in any decisions as to Plaintiff's medical care or whether he should be isolated. Sheriff Holloway is therefore entitled to summary judgment on the individual capacity claim against him.

With respect to Lieutenant Holt, Plaintiff maintains that she did not give proper consideration to his grievances about his medical care. Rather, she would either reply that the medical staff made all medical decisions or else re-route the grievances to the medical staff—the very people Plaintiff was complaining about. No constitutional claim has been stated as to Lieutenant Holt. "Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates." *Ashann-Ra v. Commonwealth of Va.*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000) (citations omitted). "If a jail or prison elects to provide a grievance mechanism, violations thereof will not give rise to a § 1983 claim." *Benford v. Dunklin Cnty.*, 2018 WL 1947116, *2 (E.D. Mo. Apr. 25, 2018). The right protected is access to the courts. *Lomholt v. Holder,* 287 F.3d 683, 684 (8th Cir. 2002). Lieutenant Holt's failure to process Plaintiff's "grievances, without more, is not actionable under section 1983." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).

Further, Lieutenant Holt, who was not a nurse or physician, was free to rely on decisions made by the medical personnel. *See, e.g., Layne v. Vinzant*, 657 F.2d 468, 471 (1st Cir. 1981) (finding that once it is determined medical personnel are treating the inmate, prison officials are entitled to rely on the opinions of the treating medical

14

personnel).  There is no evidence of deliberate indifference on the part of Lieutenant Holt. Lieutenant Holt is therefore entitled to summary judgment on the individual capacity claim against her.

Plaintiff has also asserted official capacity claims against Sheriff Holloway and Lieutenant Holt.  These claims are equivalent to claims against Benton County.  To establish Benton County's liability under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).  Plaintiff has pointed to no such custom or policy of Benton County. Sheriff Holloway and Lieutenant Holt are therefore entitled to judgment in their favor on these official capacity claims.

### B. Exposure to Contagious Diseases

### 1. Relevant Facts

The facts pertinent to this claim were set forth above in connection with the denial of medical care claim.

### 2. Analysis of Contagious Diseases Claim Against Nurse Ramos

Plaintiff contends Nurse Ramos exposed him to inmates who had contagious diseases. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted).  Inmates are entitled to reasonably adequate conditions of confinement.  Prison-condition claims include threats to an inmate's health and safety.  *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

15

"Staph infections are caused by staphylococcus bacteria, types of germs commonly found on the skin or in the nose of even healthy individuals." https://www.mayoclinic.org/diseases-conditions/staph-infections/symptoms-causes/syc-20356221 (accessed October 4, 2018). "These bacteria can also be transmitted from person to person." *Id.* Staph bacteria can also be transmitted through inanimate objects. *Id.* "The most common type of staph infection is the boil, a pocket of pus that develops in a hair follicle or oil gland. The skin over the infected area usually becomes red and swollen." *Id.*

"[S]taph-type skin infections [are] common within the community of incarcerated offenders." *Jenkins v. Livingston*, 2010 WL 3853099, at *5 (E.D. Tex. Aug. 31, 2010). "The probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, insufficient infection-control expertise, and prohibitions against the use of proven harm-reduction tools, such as condoms and sterile needle exchange." Joseph A. Bick, Infection Control in Jails and Prisons, *Clinical Infections Diseases* Vol. 45 Iss. 8, Pgs. 1047-1055, 1047 (Oct. 15, 2007). With this background, the Court turns to an analysis of the claims before it.

To establish an unconstitutional conditions of confinement claim, Plaintiff must establish both an objective and subjective component. *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (citing *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)). Objectively, the Plaintiff must show that he was exposed to inmates with contagious diseases "in a manner that created an unreasonable risk of serious harm to his health." *Id.* Subjectively,

the Plaintiff must establish that defendants actually knew of but deliberately disregarded that substantial risk of harm. *Id.*

Considering the objective component, it is undisputed that Plaintiff was *not* exposed to an inmate with active TB and *did not* contract TB. However, viewing the facts in the light most favorable to the Plaintiff, he did contract a staph infection within a short period of time after TW had a staph infection.[3] TW was in the same pod as the Plaintiff. On July 10, 2017, Plaintiff submitted a grievance that TW, an inmate with a staph infection on his knee, was seen by medical personnel on July 7, 2017, but was not isolated or removed from the pod until July 9, 2017. (Doc. 52-3, p. 8). Plaintiff did not name Nurse Ramos in this grievance. *Id.* Plaintiff later complained that TW was merely locked down in the same pod. *Id.* at 10. When TW was released for an hour each day in the pod day room, he was using the same phone, public restroom, shower, and tables as the other inmates in the pod. *Id.* Plaintiff's grievance about not isolating TW was responded to by Jason Zemer.

On July 18, 2017, Plaintiff submitted a medical request stating he was "quite certain that [he had] a sta[ph] infection on [his] upper left thigh." (Doc. 52-3, p. 13). He was first seen by medical personnel for this complaint on July 19, 2017. Medical personnel noted that Plaintiff told them the abscess had developed three days before and

---

[3] Nurse Ramos objected to interrogatories regarding the diagnoses of MJ and TW on the grounds the Health Insurance Portability and Accountability Act precluded disclosure of such information. (Doc. 63, p. 23). Plaintiff contends he could not obtain sworn statements from fellow inmates because of his limited knowledge of the law and because he was denied any prisoner correspondence while in the ADC. (Doc. 63-1, p. 9). The Court notes that Plaintiff did not file a motion asking to be allowed to correspond with fellow inmates. Further, the Court notes that it is clear from Plaintiff's response that he has significant knowledge of the law regarding the claims he is asserting. *See* Docs. 63 & 63-1.

Plaintiff thought it was a spider bite.[4] (Doc. 52-2, p. 13). There is no mention in the medical file of a culture being performed on Plaintiff's wound or of Plaintiff being diagnosed with a staph infection. The record is also silent as to the diagnosis of TW, who was in the pod in July of 2017, or of MJ, who was in the pod in May of 2017. Plaintiff eventually submitted a report indicating there were nine inmates with staph infections in the BCDC in June of 2017 and ten inmates with staph infection during the month of July 2017. (Doc. 63, p. 20). The report lists the total number of inmates having staph infection each month. *Id.* The inmates are not identified, nor is there any indication of where they were housed. *Id.* The report therefore does not establish that the infected inmates were in contact with the Plaintiff. On the other hand, it is conceivable that the staph bacteria could have been transmitted, had it been present in TW or MJ, through their contact with the sink or stool in the common restroom or through contact with other surfaces within the pod. Viewing the facts in the light most favorable to the Plaintiff, he has established a genuine, material dispute of fact as to whether he was exposed to an inmate who had staph in a manner that created an unreasonable risk of serious harm to his health.

The next question the Court must address is whether a genuine issue of fact remains as to the subjective component of this claim—whether Defendants knew of the serious risk of harm but deliberately disregarded it. By affidavit, Nurse Ramos states that

---

[4] "Sometimes, people with [staph] skin infections first think they have a spider bite. However, unless a spider is actually seen, the irritation is likely not a spider bite. Most staph skin infections . . . appear as a bump or infected area on the skin that might be: Red; Swollen; Painful; Warm to the touch; Full of pus or other drainage; [or] Accompanied by a fever." https://www.cdc.gov/mrsa/community/index.html (accessed October 4, 2018) (bullet points omitted).

he did not have the authority to segregate inmates. (Doc. 52-1, p. 2). Instead, Nurse Ramos explains that the segregation of inmates was coordinated by SHP's Medical Team Administrator and the BCDC's jail administration. *Id.* While Plaintiff finds it difficult to believe a nurse would not have authority to segregate an inmate, to establish that Nurse Ramos deliberately disregarded a known substantial risk of harm, Plaintiff must articulate facts that would illustrate Nurse Ramos' part in the wrongdoing. Even assuming the infected inmate was diagnosed as having a staph infection on July 7, 2017, nothing in the record suggests Nurse Ramos was present at the time of the diagnosis or even knew of the diagnosis prior to July 9, 2017, when the inmate was moved. Plaintiff has failed to show that there is a genuine issue of fact as to whether Nurse Ramos actually knew of but deliberately disregarded that substantial risk of harm. Nurse Ramos is entitled to summary judgment on the individual capacity claim.

Plaintiff has also asserted an official capacity claim. As discussed above, for SHP to be held liable, Plaintiff must establish that there is a written policy or pattern of widespread unconstitutional conduct that was the moving force behind the unconstitutional actions. Plaintiff has not identified any custom or policy that caused him injury. Instead, Plaintiff has alleged that the policy of isolating inmates with contagious disease was not followed in the three cases[5] of staph infection that he was aware of. *See, e.g., Walton v. Dawson,* 752 F.3d 1109, 1122 (8th Cir. 2014) ("[V]iolating an internal policy does not *ipso facto* violate the Constitution."); *Kennedy v. Blankenship,* 100 F.3d 640, 643 (8th Cir. 1996) (failure to follow supposedly valid policy does not state a claim for relief).

---

[5] This number includes the Plaintiff.

To establish a custom, Plaintiff must show:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the . . . entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the . . . entity's policymaking officials after notice to the officials of that misconduct; and

(3) The plaintiff's injury by acts pursuant to the . . . entity's custom, *i.e,* proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (internal punctuation marks omitted, and citation omitted). The identification of three inmates—including Plaintiff--who were not isolated falls far short of establishing a custom. While Plaintiff testified that he was aware of other inmates, he did not quantify the number of inmates or provide factual information about these inmates. No official capacity liability exists here. For these reasons, Nurse Ramos is entitled to summary judgment on the official capacity claim.

### 3. Analysis of Contagious Diseases Claim Against Benton County Defendants

Plaintiff does not contend Sheriff Holloway was aware of Plaintiff's alleged exposure to staph. Plaintiff does not suggest the he had any personal interaction with Sheriff Holloway. Further, Plaintiff presents nothing on summary judgment that would suggest Sheriff Holloway was involved in any way in determining if a given inmate should be isolated. There is therefore no basis to hold Sheriff Holloway liable in his individual capacity.

With respect to Lieutenant Holt, Plaintiff testified that she was the main person who answered grievances at the BCDC. (Doc. 59-6, p. 46). Accordingly, Plaintiff believed Lieutenant Holt was responsible for "finding a remedy for certain things" and was

negligent if she failed to do so. *Id.* With respect to moving inmates to other areas in the facility for medical reasons, Plaintiff indicated that Lieutenant Holt did not even contact the medical staff about his complaint or forward them his grievances. *Id.* at 48. He felt Lieutenant Holt had the authority to take someone out of the pod and put them in medical holding if she wished to do so—based not on any medical decision-making on her part, but on common sense. *Id.* at 51-52.

First, the Court finds that Lieutenant Holt's liability cannot be premised on the fact that Benton County contracted with SHP to provide medical care. Instead, to hold Lieutenant Holt individually liable for violating Plaintiff's constitutional rights, she must have been personally involved in the alleged unconstitutional conduct. Here, Plaintiff attempts to premise Lieutenant Holt's liability on her handling of his grievances. The fact that she received the medical grievances and did not address them directly but instead forwarded them to SHP cannot form the basis for her liability. Instead, she must have personally been involved in Plaintiff's medical care or interfered with Plaintiff's medical treatment. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) (supervisory liability arises if the supervisor knowingly facilitated, approved, condoned, or turned a blind eye to unconstitutional conduct). At most, the fact that Lieutenant Holt reviewed and forwarded Plaintiff's medical grievances to the medical staff establishes that she was aware of Plaintiff's dissatisfaction with the actions of the medical staff. "[I]t is not deliberate indifference when an official relies on the recommendations of a trained professional." *Drake ex. rel Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006). The evidence therefore does not support a finding that Lieutenant Holt was deliberately indifferent to Plaintiff's

exposure to a contagious disease. Lieutenant Holt is entitled to summary judgment on this individual capacity claim.

Plaintiff has also asserted official capacity claims against Sheriff Holloway and Lieutenant Holt. Plaintiff has not identified any custom or practice of Benton County other than the fact that medical questions are referred to medical staff and detainees identified as having communicable diseases are segregated as directed by medical staff. (Doc. 63, p. 49). Furthermore, Sheriff Holloway maintains that "[p]rotocols and medical policies are not adopted, supervised, or enforced by Benton County." *Id*. at 52. Instead, the County relies on the "professional medical judgment of the medical staff." *Id*. There is simply no evidence of an unconstitutional policy or custom adopted by Benton County that was the moving force behind the alleged violation of Plaintiff's rights. *Wilson v. Spain*, 209 F.3d 713, 717 (8th Cir. 2000). Sheriff Holloway and Lieutenant Holt are therefore entitled to summary judgment on the official capacity claims against them.

### C. Denial of Access to the Library

#### 1. Relevant Facts

The BCDC recognizes inmates have certain rights, including the right to "reasonable access to the courts through counsel whether appointed or retained, and in the event, counsel has not been retained or appointed, the inmate should have reasonable access to law library materials." (Doc. 59-5, p. 1).

The BCDC has a "single computer that has access to a legal research engine which is available for use by detainees." (Doc. 59-1, p. 3). Because of the number of inmates and the limited resources available, requests for access to the law library are screened so that inmates who are not represented by counsel are able to conduct

research in the cases in which they are acting *pro se*. *Id.* Detainees are asked if they have an attorney. If a detainee says he does not, the inmate is asked for the "type of case to try to verify that the detainee is providing accurate information." *Id.* Inmates representing themselves are allowed "access to the computer legal research engine on a reasonable basis." *Id.*

Lieutenant Holt oversaw law library requests when Plaintiff was incarcerated at the BCDC. (Doc. 63, p. 53). Lieutenant Holt indicates she did not "give Plaintiff access to the computer/law library because he was represented by an attorney and did not have a pending case in which he was his own attorney. After he filed a case where he represented himself, he was given access to the law library." (Doc. 59-1, p. 3). The record reveals that on April 28, 2017, Plaintiff asked for law library access. (Doc. 54-6, p. 1). Plaintiff testified that he had wanted to research to see how he could get relief from his "illegal sentence," and he wanted to "overturn [his] guilty plea." (Doc. 59-6, p. 62). He was asked by jail staff if his request to use the law library was in relation to his criminal matter. (Doc. 54-6, p. 1). When he replied that it was, he was told he could obtain information from his attorney. *Id.*

Plaintiff testified that he never saw or spoke to his attorney after his sentencing on March 30, 2017. (Doc. 59-6, p. 18). He further testified that his paper judgment in his criminal case was amended twice. *Id.* at 17. The first amendment was to "fix his credited jail time." *Id.* The second amendment was to uncheck the "sex offender" box. *Id.*

On May 5, 2017, Plaintiff again asked for access to the law library. (Doc. 59-3, p. 7). He told jail officials that he was acting *pro se* and was seeking information on post-conviction relief and did not have an attorney. *Id.* Lieutenant Holt responded that his

23

inquiry had already been addressed in a separate grievance. *Id.* Plaintiff testified that the main thing he wanted to do was file a motion under Rule 37 of the Arkansas Rules of Criminal Procedure. (Doc. 59-6, p. 18). As of October 23, 2017, the date his deposition in the case at bar was taken, Plaintiff had not filed any type of complaint regarding his criminal conviction or his criminal attorney's representation of him. *Id.* at 24. He did indicate during the deposition that he was working on a belated Rule 37 petition. He claims he did eventually submit that petition to the state court, but it was denied as untimely. (Doc. 63, pp. 47-48).

On May 12, 2017, Plaintiff submitted a jail grievance noting that he had been asking for law library access since April 28th. (Doc. 59-3, p. 9). Plaintiff stated in the grievance that he was acting *pro se* and post-conviction. *Id.* Lieutenant Holt responded to the grievance by asking him what court the case was in. *Id.* Plaintiff replied that the case was in the appellate division. *Id.* Plaintiff testified that he told Lieutenant Holt that the case was in the appellate division because he eventually wanted to appeal his criminal case. (Doc. 59-6, p. 63). At that time, however, Plaintiff had not yet filed his appeal. Plaintiff asked Lieutenant Holt what business it was of the jail's to ask what court the case was in, and Lieutenant Holt responded, "You have a RIGHT to the law library if you don't have legal representation. I have a RIGHT to verify if you do/don't based on your answers. So again, where is your court case (specifically)?" (Doc. 59-3, p. 9). After Plaintiff replied that he was seeking access to look up "post conviction information," Lieutenant Holt responded: "Again, and I will not continue to ask, what court do you SPECIFICALLY have an OPEN case in." *Id.* Finally, Plaintiff admitted that he did not

have an open case, and Lieutenant Holt replied that Plaintiff was not entitled to law library access. *Id*. Plaintiff was told he could contact his attorney at the time of conviction. *Id*.

On May 15, 2017, Plaintiff again asked for law library access, noting that he did not have an attorney and would be acting *pro se*. (Doc. 54-1, p. 24). Lieutenant Holt responded that she had addressed the law library issue multiple times and asked who his attorney was during his sentencing. *Id*. at 25. Plaintiff later testified in the instant case that he did not tell Lieutenant Holt who represented him at sentencing. *Id*. at 26. Plaintiff filed the instant civil lawsuit on June 6, 2017. On June 23, 2017, Plaintiff once again requested permission to access the law library. (Doc. 59-3, p. 19). He indicated in his request that he was acting *pro se* in a § 1983 case. *Id*. Lieutenant Holt replied that his request was approved.

On July 23, 2017, Plaintiff submitted a grievance stating he was told law library access was only from Monday through Friday. He asked if that was true and noted he had been approved to go. (Doc. 59-3, p. 23). On July 24, 2017, Plaintiff submitted another grievance stating he was denied access "yesterday when I asked Deputy Blake." *Id*. On July 26, 2017, Lieutenant Holt replied to his grievance that there was a schedule to be followed concerning when access to the law library was permitted. *Id*. On July 26, 2017, Plaintiff submitted a grievance stating the law library was inadequate because it had no copier and no copies of motions. Lieutenant Holt replied on July 27, 2017, that Plaintiff could bring a pencil and paper to the law library to take notes and copy information down. *Id*.

In response to interrogatories concerning Plaintiff's law library access claim, Lieutenant Holt stated that "[b]ecause of the limitations such as sufficient time and space,

the use of the Westlaw computer program at the jail is limited to those detainees who have pending cases where they are not represented by an attorney." (Doc. 63, p. 44). When an inmate asked for access, Lieutenant Holt indicated she would "inquire about the case they seek access for (civil or criminal) and whether they have an attorney. If they do have an attorney representing them on that case, they will not be given access to the computer program." *Id.*

### 2. Analysis of the Denial of Access to a Law Library Claim

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates *in the preparation and filing of meaningful legal papers* by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (emphasis added). An inmate has no standing to pursue an access claim unless he can demonstrate he suffered prejudice or actual injury because of the prison officials' conduct. *See Lewis v. Casey*, 518 U.S. 343, 351-2 (1996).

Thus, "[t]o prove a violation of the right of meaningful access to the courts, a prisoner must establish [1] the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, [2] which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'" *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted). "Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that

a library was so inadequate that it prevented them from filing a complaint for actionable harm at all." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996) (citation omitted).

Plaintiff informed Lieutenant Holt in several of his grievances that he was proceeding *pro se*. Telling an inmate that he must have an open or pending case before he can have access to the law library is not only an inadequate response, but it flies in the face of well-settled law. The right protected by *Bounds* is to ensure inmates have meaningful access to the courts in the preparation and filing of habeas corpus petitions, post-conviction relief, and civil rights actions. Interpreting the facts presented on summary judgment in the non-movant's favor, it appears Plaintiff was wrongfully denied access to the law library. However, to establish he was denied meaningful access to the courts, Plaintiff must show he suffered actual injury or prejudice as a result. *Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) (even a showing of complete and systemic denial of access to a law library or legal assistance does not establish a denial of access to the courts claim).

Plaintiff's sentencing order was filed on April 28, 2017. [6] (Doc. 59-2, pp. 5-9). Although the general rule in Arkansas is that there is no appeal from the entry of a guilty plea, this rule has several recognized exceptions including an exception for an appeal from a motion to amend or correct an illegal sentence, which follows the entry of a guilty plea. *Reeves v. State*, 5 S.W.3d 41, 43 (Ark. 1999). A motion to correct an illegal sentence may be made at any time. *Williams v. State*, 479 S.W.3d 544, 545 (Ark. 2016). An appeal may follow from the denial of a motion to correct an illegal sentence. *Bradford*

---

[6] As noted in the facts, Plaintiff testified in his deposition that the sentencing order was amended two times. The Court has been provided with the sentencing order signed April 28, 2017, nearly a month after the entry of Plaintiff's guilty plea on March 30, 2017.

*v. State*, 94 S.W.3d 904, 907 (Ark. 2003). A Rule 37 petition must be filed within ninety days of entry of the judgment. Ark. R. Crim. P. 37.2.

Plaintiff argues he was harmed because he was unable to conduct timely research with respect to filing an appeal in his criminal case or submitting a motion for post-conviction relief under Rule 37. Plaintiff believes his sentence was illegal because he was ordered to register as a sex offender and ordered to have "[n]o access to digital cameras or cell phones." (Doc. 59-2, p. 9). Plaintiff first requested library access the day his sentencing order was entered, April 28, 2017. His request for library access was not granted or approved until June 23, 2018. The ninety-day deadline to file a Rule 37 petition ran on July 27, 2017. There is no time limit on the filing of a motion to amend or correct an illegal sentence. In light of these facts, Plaintiff's access to the courts claim fails because he was given access to the law library when he had sufficient time, more than a month, to file a Rule 37 petition or a motion to amend or correct an illegal sentence.[7] Plaintiff cannot show actual injury. Accordingly, Plaintiff lacks standing to pursue this claim, and Sheriff Holloway and Lieutenant Holt are entitled to summary judgment.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that:

(1) the Motion for Summary Judgment (Doc. 50) filed by Nurse Ramos is **GRANTED**, and all claims against him are **DISMISSED WITH PREJUDICE**;

---

[7] Defendants are hereby placed on notice that the responses given to the Plaintiff regarding inmate use of the law library did not comply with well-established constitutional law. While Plaintiff cannot prevail in his denial of access claim here, in a similar case where actual injury is shown, the BCDC may be subject to liability.

(2) the Unopposed Motion for Summary Judgment (Doc. 54) filed by Catering by Marlins and Emily Hofer is **GRANTED**, and all claims against them are **DISMISSED WITH PREJUDICE**; and

(3) the Motion for Summary Judgment (Doc. 57) filed by Sheriff Holloway and Lieutenant Holt is **GRANTED**, and all claims against them are **DISMISSED WITH PREJUDICE**.

Judgment will enter contemporaneously with this Order.

**IT IS SO ORDERED** on this  day of December, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE